## Laubach *versus* Laubach.

1. J. sold stock to T., and agreed that when T. should desire it, he would take it back and repay the price. *Held*, that upon tender of the stock T. might recover the price with interest.

2. On a refusal by a vendee to accept goods sold him, the measure of damages is the difference between the contract and the market price at the time of refusal.

3. Where the contract is that the vendee may rescind the contract, the vendor to pay back the price, or the contract is rescinded by the vendee by reason of inherent vice, the measure of damages is the price paid and interest.

4. Where there is a general objection to evidence and part is admissible, it is not error to overrule the objection, although part of the offer be inadmissible. In such case there must be a special objection to the inadmissible part.

March 20th 1873.   Before READ, C. J., AGNEW, SHARSWOOD, and MERCUR, JJ.   WILLIAMS, J., at Nisi Prius.

Error to the Court of Common Pleas of *Lehigh county*: No. 152, to July Term 1872.

This was an action of assumpsit, brought April 22d 1870, by Thomas Laubach against Joseph Laubach.

The plaintiff alleged that in August 1858 he bought from the defendant, his brother, 100 shares of the capital stock of the Brown Silver Mining Company for $5000, the defendant agreeing at the time, as part of the contract, to take it back if the plaintiff should desire it and repay the sum paid for it. . The plaintiff having tendered the stock and demanded the repayment, the defendant refused, and this suit was brought for the recovery of the money with interest.

The plaintiff testified that in August 1858 he met the defendant at Catasauqua, in the Eagle hotel, kept by Frank Laubach, defendant's son. The defendant, after he and his son had exhibited the promising prospects of the mine and solicited the plaintiff to purchase stock, said that if plaintiff would take stock he would insure it to him, and if at any time plaintiff wanted his money back, defendant would take the stock and give him his note for it. Defendant said that they had $20,000 worth of stock for the Laubach family and their friends. Upon these assurances, the plaintiff took 100 shares of stock and paid the defendant $5000 for it. Subsequently three certificates of the stock, making in the aggregate 100 shares, were delivered to plaintiff.

On March 5th 1870, the plaintiff signed transfers on the back of the certificates, and tendered them to the defendant, and said to him, "Here is the stock you said you would take back any time I did not want it, and give me my money back;" defendant denied having promised him that he would take the stock and pay back the money.

[Laubach *v.* Laubach.]

The plaintiff testified to other facts in support of his case, and gave other evidence in corroboration of his own statements as to the contract and of the tender of the stock and demand of the money.

Plaintiff also testified that Frank and William Laubach, sons of the defendant, were present when the contract was made, and were called by their father to bear witness to what he said, and also that they were present on other occasions when the father made similar statements.

Frank Laubach testified in direct contradiction of the plaintiff, as to the interview and what was said to have occurred in his presence.

On cross-examination he said:—" Thomas offered, in the parlor, in presence of Adam, on my inducement, to take the stock; my father wasn't in the habit of selling this stock; he never sold any stock; my father never sold any stock to Mrs. Strauss; nor to John Laubach; nor to John A. Laubach; nor to Adam Laubach; nor to Captain John Laubach; nor to Michael O. Newhart; don't know that he offered to sell to Samuel Straub; nor do I know whether he guarantied the stock to Mrs. Strauss; he never guarantied stock to anybody in my presence;    *    *    *
I didn't direct my father to sell this stock to Mrs. Strauss; I sold it to her indirectly; I saw her before the sale was made, at Catasauqua, and induced her to take it:    *    *    *
my father was not my agent to sell stock for me;    *    *    *
I never heard my father say anything to Capt. John Laubach about the sale of this stock; nor did I ever hear that he guarantied the stock to him; nor that he guarantied it to any one else; I sold the stock to Mrs. Matchett; she never paid the whole of it; I sold it for her to my father; it was not sold on a guaranty; it was three shares; Michael and Owen Newhart got stock from me; I sold it directly to them; I got the money; it did not pass through my father's hands; it was paid to me directly; my father knew nothing about my transactions with these people, except with plaintiff; Adam Laubach got forty shares from me directly; my father didn't guaranty it to Adam; am sure he didn't; plaintiff was at my house in March 1870, when he tendered the stock back; he was there once after that."

William Laubach also testified in direct contradiction of plaintiff's testimony.

Joseph Laubach, defendant, testified in the same manner as his sons.

He further testified:—" I was not the owner of the 100 shares sold to Thomas; had no interest in them at all; I got none of the proceeds of the sale, nor did I tell my brother, John Laubach, that if Thomas took stock I would take it back; I never promised any man that I would take stock back; I had some conversation with my brother John, but I didn't say that to him; I think it was in November 1869 that plaintiff for the first time came to

[Laubach v. Laubach.]

me and said he wanted me to pay him for the stock I guarantied to him. I said 'What stock?' He said, 'The Brown Silver Mining stock;' I said I had never sold him any stock, and had never guarantied him any; he came to me several times about it, and teased me about it; I told him if he didn't like me as a brother he could shoot me and have me out of the way; I never made him any promise that I would take the stock back from him at any time."

On cross-examination, he said:—

"I sold some stock to Mrs. Strauss, with the consent of my son; her name was Laubach; I got the money for it and gave it to my son; I got two checks, payable to me; I made the contract with her to take the stock; I didn't guaranty to take it back; I told her at any time she didn't want it I would take it back and pay her the money with interest; I told her that at any time she was tired of it I would take back the stock and pay the money with six per cent. interest; I did take it back; I never sold Capt. John Laubach one share of stock; I didn't sell him a share, nor make the same promise to him as I did to Mrs. Strauss; on my return from Easton, I stopped to see my sister, Mrs. Bachman; I offered to sell her stock, and told her if she would take it I would guaranty it, the same as I had done to Mrs. Strauss; I did not to my recollection ask Samuel Straub to buy stock; I didn't tell him that we had $20,000 expressly for the Laubach family and their friends, and that he was one of their friends; I didn't tell him that I had sold stock and had guarantied it; didn't tell him I had sold stock at Catasauqua, and that I had guarantied it all or insured it, nor anything of the kind; I told Aaron Fretz that I had got all in except Adam, and I would have him in yet; I said I would try; didn't sell stock to my brother John; didn't guaranty it to him the same as I did to Mrs. Strauss; didn't sell to Capt. John Laubach and guaranty it also; nor to John A. Laubach and guaranty it, nor to Adam Laubach and guaranty it, nor to Michael and Owen Newhart and guaranty it; nor did I tell Owen Newhart, in the presence of Michael, that I would take the stock back if he didn't like it; nor to Michael, and guaranty it in the presence of Owen; I didn't say anything to Captain John Laubach, John Laubach, John A. Laubach, Adam Laubach and Michael and Owen Newhart, and Samuel Straub about selling stock to them; I offered Hannah Schadt stock, but I never said anything about $20,000 worth of stock for the Laubach family; I told her I would take the stock back at any time she was tired of it, and pay the money back; I went to see her, to know if she wanted stock; she had no money and took no stock; I told her it was paying one per cent., but I didn't tell her she would get back all her money in two or three years; I told David Schadt it was a good thing, and told him he should get his

[Laubach *v.* Laubach.]

sister to buy; I didn't tell Thomas and Adam nor any of the Laubachs that there was $20,000 reserved expressly for the family." * * *

The plaintiff in rebuttal called Capt. John Laubach, and offered to prove by him "that Joseph Laubach offered to sell him stock, and did sell it to him, and guarantied it, alleging at the time that it was a portion of the $20,000 worth of stock which he had expressly reserved for the Laubach family."

Objected to by the defendant's counsel as not rebutting testimony; that it is in relation to matters collateral to this suit; that it is irrelevant and cannot be offered to contradict the testimony of Joseph Laubach; that if it is evidence at all it is evidence in chief. "Plaintiff says the testimony is offered for the purpose of rebutting the allegations of the defendant, that he was not engaged with the sale of the Brown Silver Mining Company, and for the purpose of contradicting Frank, Joseph and William Laubach."

The offer was admitted and a bill of exceptions sealed.

Witness said: "The defendant offered to sell me stock of this company in the beginning of August 1868; it was at his place at the Eagle Hotel; he said he had $20,000 worth expressly for the Laubach family; I told him I couldn't see the point yet; I had enough water-hauls; then he said, if you don't like it I'll pay your money back; then he told me the per cent.; one, two and three per cent. a month; he said, you shall just take it, and if you don't like it you come to me and I will pay your money back, and if I haven't the money I will give you my note; he said he had all the family in except Adam and John, and he would get them in yet; I gave this note as part payment of the stock; I gave defendant all the money, I gave him $5000 in all."

Plaintiff then called each of the other persons to whom the defendant denied in his testimony that he had sold stock, and proposed similar questions to each of them. They were admitted under exception and objection to testify.

They testified substantially in accordance with the offer.

The plaintiff offered in evidence the book, the pamphlets and circulars of the company and the notes and checks testified to by the witnesses. They were objected to by the defendant, admitted by the court, and a bill of exceptions sealed.

The court (Longaker, P. J.), amongst other things, charged:— * * * " Before you proceed to weigh the strength or power of the evidence, it becomes the duty of the court to admonish you that if you find it to be a fact that the defendant was engaged in selling the stock to others, and that he guarantied to them and promised to redeem at par the stock thus sold, the fact so proven is not a circumstance from which you are at liberty to infer or find that the defendant made a like promise to the plaintiff. Because the defendant may have promised others to redeem the stock sold to

[Laubach v. Laubach.]

them is no reason which will enable you to say that he promised the plaintiff to redeem the stock in suit.

"The plaintiff was permitted to prove that the defendant made the guaranties to others, in order to show that he was engaged in the sale of this stock, and to meet that part of the defence in which it is said that the defendant was not engaged in the sale of this stock, but that his son Frank was the agent of Watson; and that he, and not his father, made this sale, and that the father had nothing to do with effecting a sale of this stock to plaintiff."

*    *    *

"If under these instructions you cannot find a contract of guaranty in favor of the plaintiff, your verdict will be generally in favor of the defendant; [if, however, you do find in favor of the plaintiff, the amount of your verdict will be for $5000, with interest from March 5th 1870.]"

The verdict was for the plaintiff for $5582.50. The defendant took a writ of error, and assigned for error :—

1. That part of the charge in brackets.

2-10. Admitting John Laubach and the other witnesses objected to.

11. Admitting the pamphlets and circulars of the company, &c., in evidence.

*H. Green* and *C. M. Runk*, for plaintiff in error.—The measure of damages was the difference between the contract price and the value of the chattels at the time of the breach : Story on Sales, sect. 348 ; Phillpot *v.* Evans, 5 M. & W. 475 ; Laird *v.* Pine, 7 Id. 478 ; Boorman *v.* Nash, 9 Barn. & Cress. 145 ; Andrews *v.* Hoover, 8 Watts 239 ; McCombs *v.* McKennan, 2 W. & S. 216 ; Thompson *v.* Algeo, 12 Metc. 428 ; Bowser *v.* Cessna, 12 P. F. Smith 148. If a witness be asked on cross-examination as to a collateral fact, his answer is conclusive against the party asking him : 1 Green. Ev., sect. 449 ; Elliott *v.* Boyles, 7 Casey 65 ; Hollingham *v.* Head, 4 Com. B. N. S. 338.

*E. Harvey* and *J. D. Stiles* (with whom was *C. D. Erdman*), for defendant in error.—This was not a contract to sell shares of stock, but to pay back the money and interest; after refusal the plaintiff could have sold it or held it subject to defendant's order, and recovered the whole sum : 3 Parsons on Contracts 209 ; Bement *v.* Smith, 15 Wend. 493 ; Crookshank *v.* Burrell, 18 Johns. 58 ; Towers *v.* Osborne, 1 Strange 506 ; Thompson *v.* Algeo, 12 Metc. 443 ; Ballentibe *v.* Robinson, 10 Wright 180.

The opinion of the court was delivered, March 27th 1873, by

SHARSWOOD, J.—The first assignment of error is intended to raise the question, whether the instruction of the learned judge

[Laubach *v.* Laubach.]

below to the jury, as to the measure of damages, was correct. There was no dispute as to the amount which the plaintiff had paid for the stock, nor that he had made a regular and formal tender of it back to the defendant, and demanded the return of the money, or a note, in conformity with the agreement. The plaintiff in error supposes that the same rule is applicable in this case as in the ordinary case of the refusal of a vendee, before any title to the property has passed to him, to accept goods which he had previously agreed to buy. The authorities which have been cited abundantly show that there the measure of damages is the difference between the contract and the market price at the time of the refusal or breach. But the mistake is in considering that this was a contract to purchase or repurchase. If the jury believed the testimony of the plaintiff, and that was left to them, and upon his credibility the whole controversy hinged, then it was an agreement by which, as one of the terms of the sale, the plaintiff was to be at liberty to rescind the contract, and the defendant undertook in that event to pay back the price or give his note for the amount. It is like the very common case of the purchase of a horse, where the buyer pays the price, but stipulates that after a reasonable trial, if he should not be satisfied with the animal he may return him and receive back the price paid. No one has ever supposed that this was to be construed as a contract to repurchase, or that upon the exercise by the vendee of the option reserved, the title does not revest in the original vendor, and the right to the price in the vendee. This is the legal effect of the rescission of a contract, whether the rescission be by reason of an inherent vice, such as fraud, or by virtue of the terms of the contract itself: Smethurst *v.* Woolston, 5 W. & S. 106.

The nine following assignments all relate to one and the same question. The plaintiff had testified that the defendant stated to him as an inducement to the purchase, that he had reserved twenty thousand shares of the stock of the company in dispute, for the Laubach family, from which the inference was, that he was the agent of the company for the sale of the stock. When the defendant was put upon the stand as a witness for himself he denied that he had made this statement, and that he had ever said anything to certain persons named about selling stock to them. This was certainly relevant to the issue trying, and the defendant might be contradicted in regard to it, for it bore directly upon the main question, whether he or his son Frank had made the sale to the plaintiff. It was true he was also asked whether he had guarantied the stock sold to these persons, as it was alleged he had done to the plaintiff. It may well be that this was entirely collateral and irrelevant, and his answer conclusive according to the familiar rule, that a witness cannot be contradicted as to collateral and irrelevant matter brought out upon cross-examination. It is, how-

[Laubach *v.* Laubach.]

ever, unnecessary to decide this, because the offer to contradict him in this respect by the testimony of the persons, who had been named to him, was made in connection with an offer to contradict him as to the other relevant matter that he had not spoken to them about the sale of the stock. The objection to the offer was a general one, and if any part of it was admissible the judge cannot be convicted of error in overruling such general objection. In such a case it is the duty of the party objecting to call the attention of the judge particularly to that part which is inadmissible by a special objection. This is but fairness to the judge. In the pressure upon his mind in the necessary hurry of a jury trial, he cannot be required to scrutinize narrowly every part of an offer, and to distinguish in it the admissible from the inadmissible, though he may do so ; and especially is this true, when the objection goes merely to relevancy, the shades of difference as to which are often so slight. The learned judge below, in his charge, instructed the jury that the fact that the defendant had guarantied and promised to redeem stock which he had sold to others, was not a circumstance from which they were at liberty to infer or find that he had made a like promise to the plaintiff. We think, therefore, that there was no error in the admission of this evidence, of which the defendant below, the plaintiff in error, has any right to complain.

As to the eleventh assignment, it is enough to say, that we have not been furnished with copies of the books and circulars of the company, so as to enable us to judge of their competency and relevancy. If the defendant was the agent of the company in making sale of the stock, of which there was some evidence, these books and circulars may well have been admissible if their contents were relevant. Indeed, this assignment does not seem to be pressed, as the counsel for the plaintiff in error did not notice or explain it, either in his printed or oral argument.

Judgment affirmed.